The next argument on the calendar is case number 21-25-31, Fox v. Starbucks. Mr. Graf, I know you're ready. Thank you. Good morning, your honors. May it please the court, I represent Raphael Fox, Paul D'Oria, and Jill Schweiner in their appeal from the district court grant of summary judgment in Starbucks' favor. I'd like to focus in first on Plaintiff Fox's retaliation claim under the New York labor law. Based on his complaints shortly before his termination about the deployment of DDVP-containing organophosphate toxic pesticide devices in his former Starbucks store in Manhattan. The record reflects that Starbucks ostensibly prohibits the use of such pesticides in its stores. But in practice, they've been found throughout the Starbucks locations in Manhattan, approximately 100 stores for a period of years. And that Starbucks even apparently reimburses stores for the purchase of these prohibited pesticides. The district court agreed that Mr. Fox engaged in protected conduct by raising his complaint to Starbucks' senior compliance specialist. The district court also agreed that the decision makers on his termination 28 days later were aware of Mr. Fox's protected complaint. But the district court nevertheless concluded that summary judgment must be granted because Starbucks proffered a legitimate and non-retaliatory justification for terminating Mr. Fox. Counselor, before you get there, could you fill me in on facts relating to whether McDonald told Ruffin that he had made this report or not? Because apparently, my understanding is that McDonald testified that she never told Ruffin, and Ruffin testified that she didn't know of the report. And Ruffin was a person with the decision-making authority, which resulted in Mr. Fox's termination. That was their testimony, and we agree with the district court that the evidence in the record supports the inference that despite their denial of McDonald having told Ruffin, the fact is that a decision was reached to terminate Mr. Fox at the end of a meeting in which McDonald participated. Tell us about the inference, because my understanding of the inference is that McDonald said that she was going to report it to him. Perhaps I'm wrong. Maybe I'm confusing you with the other person. But that she testified that she never did. I believe Your Honor may be thinking of Mr. Hutchinson, who was a district manager. Oh, maybe I'm thinking of Hutchinson. Okay. That relates to Mr. Fox's complaints. What is the evidence with respect to the inference that Ruffin knew about the report on the pesticide? All Starbucks managers have an obligation under policy to immediately escalate health or safety concerns and to report them up the chain to appropriate persons. So presumably, she would have done that. Her own supervisor was also in the meeting, and she was also in the meeting. And the inference is that the information would have been exchanged in the context of discussing Mr. Fox and the fact that he had very recently complained to her. She testified she recognized that he was upset. He was warning about a risk, especially to children, being unknowingly exposed to this. May I ask you if you have a case that supports the conclusion that at a jury trial, when the evidence is presented and the witness denies that anything was said at the meeting, the jury can certainly not believe that witness. But I'm not sure that then allows it to conclude without any evidence that the matter was discussed at the meeting. Do you have a case that says that that's permissible? I don't have one specifically on that point, but there is other evidence to suggest that their version of the meeting is not worthy of credence. For example, Ms. McDonald at the meeting allegedly said that Mr. Fox had failed to correct certain errors she had pointed out to him, when in reality, there's a written text message in the record of her instructing Mr. Fox to not do that. In the meeting, Refn allegedly... That's separate evidence. I understand that. But to the extent the district court relied on the permissibility of drawing an inference that something that the witness said was not said was in fact said, you don't have any evidence. I would think it might be that the jury simply has no evidence on what was said at that meeting. The jury would have to infer from other evidence that that was said in the manner that the district court... I mean, as far as a case, there's the district court's analysis here. And I think it goes to the totality of the circumstances, the people involved, the subjects that was being discussed, and whether or not a jury could find that it's plausible or believable that something this important would not have been discussed in the context of that meeting, given that it's particularly self-serving to Starbucks benefits, simply to deny that they considered it when, by their own policy, that should not have happened. That's something that should have been... But your client was told to tell Mr. Hutchinson about it, right? When he first mentioned it, he was told to tell Mr. Hutchinson about... He was. He also... And he did not? Not before he was terminated in the following weeks, no. Starbucks didn't say to him, don't say that. Starbucks told him to report it to someone who would have some authority, and your client didn't pursue it, right? Not at that point, although he had made... You want an inference that someone whose responsibility was HR, rather than any responsibility for the conditions at the particular sites, would have used this negatively against your client, right? Am I right? Yes, Your Honor. Somebody who's in the HR environment who gets an urgent complaint like that from a worker would presumably have done something herself. And I think their testimony from her own supervisor is that her supervisor would have expected her to have relayed that information, although she testifies that she did not. And that's a gap that we believe a jury could reasonably fill with the assumption that it must have been communicated. You did get to the court found, even though your client may have made out the prima facie case, that they had a legitimate reason for terminating him. And I gather that this did result in an inquiry into the conduct here, and Starbucks was fined or penalized in some way for the mistakes made. Why doesn't that end the case, that they did have a legitimate reason for letting him go? Your Honor, the reason for that is that Mr. Fox was one of four stores that were investigated on the same day. And the issue was the posting of schedules with advance notice under that new Fair Workweek legislation. Mr. Fox was found to have made a mistake on four schedules. Two of the other stores also had four schedule mistakes, and the fourth store had all of the schedules were posted late. So Mr. Fox's conduct was not... But there was also some issues with his transparency during the investigation, weren't there? Correct, Your Honor, and we believe that each of those three is demonstrably false by the person who advanced at McDonald's, said we can't trust him because I directed him to correct these deficiencies, which he in fact... Is there other evidence that you have that there were pretexts, or is it just that they were false? Pretext, that they were trying to invent reasons to make Mr. Fox's situation different from the other employees, so that they could justify terminating him when in fact his Fair Workweek violation was no different, and in some cases better than the comparator stores. And when the decision-makers appeared to three of them who participated in the meeting, Ms. McDonald, Ms. Ruffin, and Mr. Jennison, each one of them advanced at a basis to not trust Mr. Fox that was by their own written, close-in-time words, not true. And we would submit they should have known that, and that it's evidence of pretext, if they're padding up the reason for Mr. Fox being singled out for termination with things that they have first-hand direct knowledge of being untrue. I see my time is... You've reserved a few minutes for rebuttal. Thank you. Good morning, Your Honors. My name is Devjani Mishra. I'm here on behalf of Eppley Starbucks Corporation. Very simply, the district court's decision granting summary judgment to Starbucks should be affirmed in all respects. As to Appellant Fox, the district court properly dismissed his retaliation claim and will take the FLSA and New York labor law claim first relating to his complaint of underpayments. The court correctly found that there was no causal connection between Mr. Fox's complaint of wage underpayments by a predecessor who had already been terminated at the time the complaints were made and Mr. Fox's own termination more than three months later. Because the sole decision maker had no specific knowledge of this complaint. As Your Honors have recognized, Ms. Ruffin testified that she was not aware of the complaints of underpayments because Mr. Hutchinson, the district manager, did not relay those complaints once he himself found that there was no issue there. He did not relay an unsubstantiated complaint to Ms. Ruffin. She had no knowledge of it. With respect to the second retaliation claim, which is under the New York labor law only, the district court correctly found that Starbucks business reasons, again, his violation of the Fair Work Week law was not a pretext for retaliation. Appellant's counsel referred to Mr. Fox being singled out. It's important to know that he was not singled out. He happens to have been the first Starbucks store manager to receive an actual complaint from the Department of Consumer Affairs filed by an employee alleging violations. This was a new law. Starbucks had invested quite a bit in training managers to be sure that they would comply with the law and had, in fact, hired Ms. McDonald, who Your Honors refer to, to be a compliance specialist to focus specifically on that law and assist store managers and investigate complaints and issues as they came up. That was her purview. She was not a general manager or some sort of free-floating HR or safety representative. She was in Mr. Fox's store because there had been a complaint. In the course of her being there, Mr. Fox claims that he made a general statement about pest strips being used in some other stores, which Ms. McDonald told him to take to his district manager, the person who would be able to investigate that. There was, as Judge Raggi, as you said, there was no don't say that or please be quiet implied there. The suggestion was that the matter should be escalated to the people with responsibility to deal with it who would not have been Ms. McDonald. Judge Walker, you had asked about the inference. Not only did Ms. McDonald testify that she did not tell Ms. Ruffin and Ms. Ruffin testified that she did not hear it from Ms. McDonald, there was a third witness, Ms. McDonald's supervisor, Rachel Kelly, who was also present at the termination meeting, who also testified that she was not aware of the pest strip complaint. Nonetheless, the district court gave appellant the benefit of the doubt on this and treated it as though it was enough to get past the prima facie case stage but then correctly found that Starbucks' reasons for terminating Mr. Fox's employment were not a pretext for retaliation. Again, Mr. Fox was the first. He was not the last. Another store manager was terminated on the same basis four weeks later, and in total nine store managers were terminated during 2018 for this reason. Mr. Fox happens to have been the first one up, but this was something that Starbucks took very seriously and it was in no way a pretext for retaliation on any basis. As to the negligence claim that is raised here by Appellants Diorio and Schweiner, the district court correctly found that Starbucks contracted with their employer, AVP Termite and Pest Control, to provide pest control services, including identifying and removing unauthorized pest control devices from Starbucks stores. The record contained ample undisputed evidence that Appellants Diorio and Schweiner understood this to be part of their work, that they performed such work over a period of years, that they corresponded with Starbucks about the charges for performing these services, the fees that would be charged, and as such the court properly applied well-settled New York law and found that Starbucks did not owe Diorio and Schweiner a duty of care to protect them from hazards that are inherent and foreseeable in their work or in the condition that they were engaged to repair in providing pest control services. Further, even setting aside the duty of care issue, their claim lacks the required guarantee of genuineness under New York law for a negligent infliction of emotional distress claim. Whereas here such a claim is premised on exposure to a toxin, a plaintiff must establish not only the exposure, but also a rational basis for fear of contracting a disease or illness as a result of that exposure. And a rational basis is explicitly narrowly defined under New York law to mean either the demonstrable presence of the toxin in the plaintiff's body or a physical manifestation of some sort of contamination. Here there is no evidence to support any of this. Appellants did not proffer any evidence that the toxin was actually present in their bodies or that they had suffered any symptoms of any toxin-induced disease. And appellants essentially do not acknowledge the law or provide a reason to depart from this precedent, but merely argue that it should not apply because of the exposure itself. And that is not the standard for evaluating these claims. And the district court correctly rejected this argument and respectfully we submit that this court should do so as well. Thank you, counsel. Thank you. Thank you, Your Honor. Just very briefly to go back to Mr. Fox. The record was that he would not have been fired necessarily solely because of the Fair Work Week violations. It was only that in combination with the three other factors that are shown to have not been true and that this throws into doubt the argument that there's a neutral sufficient justification. The record also doesn't demonstrate that anybody else was fired solely because of Fair Work Week violations. The witnesses did not say that. They could not give names or explain what other factors might have been involved in those individuals' terminations. So there is a record there to find from those subsequent terminations, if they happened, that they support Mr. Fox's treatment, which again wouldn't have happened in the absence of the trust factors based on demonstrably false reasons. Turning to Mr. Doria and Ms. Schweiner, the district court cobbled together from the very long record three ambiguous emails for the proposition that this was part of the job that Doria and Schweiner were contracted to provide, that is to patrol Starbucks stores for pesticides placed in violation of Starbucks policy and to just throw them out when that came up. The record shows it was not in their scope of work duties. They never charged any funds for doing that. And they consistently, upon encountering these devices, complained that it's illegal and they can't be there, not that they don't like as part of their job having to do that part of the job,  And it continued to happen. The fact that it continued to happen doesn't transform it into their job to be reporting to Starbucks, incidentally, as part of their job, which was integrated pest management control, cracking cracks and entry and exit ways, breeding grounds to, with non-pesticides, remediate pest manifestations in stores. What about the arguments Starbucks makes that you haven't satisfied New York law's requirement to show either a level of toxin in your client's blood or some other manifestation of disability? Your Honor, on that point, the cases addressing that counsel are relying on arise in a very different context and in a different way than the exposures here. In those cases, it's generally somebody lives in the vicinity, say, of a gas station and later learns that there were toxic fumes and the courts say, well, if you're going to say that this is causing you emotional distress, how do you know what your exposure was, if it was meaningful or not? You need medical evidence. Here, Mr. Doria and Ms. Schweiner, Doria in particular, had toxic pesticides spraying or fogging up into his face on his body. So there's immediate perception and immediate terror, and in that scenario Perhaps I don't understand. I thought the hot shots were something that were placed there. I didn't think that was a spray. Am I wrong about that? The hot shots are something that's placed there and is vaporizing, but the record, and we also cited in our brief, other incidents when Mr. Doria would walk into a store and things would blow up in his face, quite literally, other versions of pesticide that also shouldn't have been there. And it was the repeated cumulative exposure that was known to him. He didn't need a doctor to say, you've been exposed in a meaningful way because it was literally dripping off of him or piled in front of his face. Well, that all depends on what kind of exposure, what the toxin is and what kind of exposure causes harm. So your clients have no evidence of toxin in their systems or any illness at this time? Not of a blood test showing the fraction that was in their body. The record also doesn't show that such a test existed at the time. But Mr. Doria is a lymphoma survivor. He did testify that he discussed it with his doctors who told them it's not good for you. Ms. Schweiner discussed it with her cardiologist who also told her it's not good for her. Mr. Doria also reached out to outside experts in the field, including Dr. Fry, who told him that it's absolutely dangerous at any of the levels that you're encountering it. Given its slightly different factual context, we would submit that the requirement in other cases for some medical proof of the fact of exposure in a way that's dangerous would simply be redundant here where the exposure was immediate and dramatic and they know from subsequent discussions with their doctors and government regulation on point that it is dangerous and should not happen to them, particularly with their pre-existing health conditions. I see I'm past my time. If the court has no other questions, we would rest on our briefs and respectfully request that the result below be reversed. Thank you, counsel. The last argument for today is in case number 21-2084, Rosbach v. Martin Furor Medical Center. Good morning. May it please the court. My name is Daniel Alteras, and I represent the appellants. We are here today because the district court dismissed my client's sexual harassment claims and personally sanctioned me, my client, and my firm over $157,000 because it decided to believe Apoly's text message expert and completely disregard our client's text message expert. In short, the district court made credibility determinations, which should have been reserved for the jury, regarding the legitimacy of certain text messages, which remains an ongoing dispute between the parties and their respective forensic experts. Your honors, respectfully, I did nothing wrong. Under oath, my client testified from a place of personal knowledge that the text messages in dispute were genuine. Thereafter, her expert testified based on his own forensic knowledge that the text messages in dispute were genuine. There was no fraud on the court. It was merely an issue of fact as to the legitimacy of certain text messages. As such, appellants respectfully request that your honors vacate the district court's decision, dismissing this case, issuing sanctions, and remand the case to another judge for further proceedings. Why remand to another judge? At the evidentiary hearing, the district court made a credibility determination, which we believe should have been reserved for the jury. It remains clear on the record that from that point on, the judge repeatedly dismissed, denied, failed to consider essentially every argument that was made until the case was ultimately dismissed. Well, we have plenty of cases that say the fact that one party constantly loses on motions and rulings is not a sound basis for recusal. Usually it's extrajudicial or some very flagrant activity by the court that indicates bias. So we submit that we would not be getting a fair determination on the merits, including with respect to the disputed documentary evidence at issue? I have another point for you, and it relates to your claim against you, and that is, didn't the district court rule that you were responsible because you negligently or recklessly failed to perform your responsibilities as an officer of the court on page 26 of the district court opinion? And that, in fact, if you are acting within the scope of your client's representation, there has to be a finding, the law requires finding a bad faith of your client. But the district court applied the wrong standard. Yes, Judge Walker. That is one of the points that we make in our briefs, that the district court erroneously found my conduct sanctionable based on a lower negligent or reckless standard reserved exclusively for representational conduct. However, the conduct at issue in this case clearly involved representational conduct. Reserved for non-representational conduct. Right. If it's representational conduct, then the test is bad faith. And she didn't apply that standard. Yes, that is one of our arguments. And, however, moving forward to even if the court were to have attempted to locate bad faith, they would not have been able to do so in the instant case. First, my client's testimony confirmed the legitimacy of these messages. That's a factual question. And you're complaining that the district court made fact findings. But if we just stick with what those fact findings were, the district court found that the text messages were fabricated. Right. So we submit that the district court did not have the ability to make those findings a fact. She pointed to pretty compelling evidence of this. I understand that one of your arguments is she shouldn't have made that finding. But if we disagree with you on that, what's your argument here then? Is it that she applied the wrong standard, that she had to find bad faith on your part? So in part that she applied the wrong standard. However, moreover, the requirement that bad faith is the standard that should have been applicable. And even so, my argument is that even though there was compelling forensic testimony on both sides of the issue, it remains yet another dispute of fact between the parties who, I might add, disagree as to the underlying sexual harassment. In other words, one of them has been essentially committing perjury about the underlying sexual harassment in this case. So that's what every case is about. And that is entitled to a jury trial to allow the fact finder to determine what did or didn't happen. Here, my client's testimony, coupled with the testimony of her forensic expert, coupled with the additional evidence in support of my client's sexual harassment claims, which does lend further credence to the legitimacy of these messages, cannot support a finding that my client, and certainly me or my firm, knowingly committed anything in bad faith. I'll also add that the court erroneously found for spoiliations in this case, my client's phone unintentionally dropping on the floor, and her unilateral decision to trade in her phone in order to have a functioning phone falls woefully short of the requisite intent to deprive. Moreover, I was unaware that she had even traded in her phone until reviewing her deposition transcripts months later. But that goes to when you learned this. I mean, I'm still concerned about your assertion that basically neither you nor your client did anything wrong. I understand where you might argue that the standard was incorrect, but the argument that this isn't fabricated, nobody did anything wrong, that's more troubling given the record we have in front of us. So there are two separate issues. My client's, I'm appealing on behalf of my client and the ultimate dismissal, because she maintains what she's maintained throughout, and is the reason I still represent her in this proceeding, that these text messages were legitimate and she received them from Mr. Morales. Moreover, the claim that despite the forensic evidence that exists with respect to our police position, there is credible forensic evidence that supports appellant's position, and the argument is that me and my firm did everything that we should have done as a matter of law, as counsel, who have a duty. Well, now you're blending the two. You're blending the two arguments. You have to argue in effect, I think, that she was, the district court was incorrect in finding that your client was intended to fabricate evidence, and spoliate evidence, and falsify evidence. And the district court made findings on that directly against your client. So that's a much harder hill for you to climb, it seems to me, than your responsibility, given the fact that the district court apparently used the wrong standard, where she specifically stated that, in this case, Altares negligently or recklessly failed to perform his responsibilities as an officer of the court, and then cited an inopposite case. And if that's the basis for her decision, that's a problem. Now, there is evidence later on that she condemns you for further, for doing it, in effect, knowing. But that wasn't what she made a finding on, apparently, arguably. And so if we were to disagree, agree that she used the wrong standard, then we would vacate or remand that part of the case to go back, or her to apply the right standard, and then make the findings under those conditions. So, there are other arguments we raised, external from the standard which was used. So, one of the arguments we make is that the district court trampled on my client's constitutional rights to a jury trial. At no point would we unnotice, my client or myself, that the court intended to adjudicate the dispositive issues of fact, and never waived her right to a jury trial. In response, the district court simply claimed that no reasonable juror would credit her testimony. However, a credible forensic expert did just that, and opined that the text messages at issue were and are legitimate. The district court also erred to provide notice and an opportunity to be heard. First, at the evidentiary hearing, I was not provided notice of the specific conduct for which sanctions were being considered. The evidentiary hearing concerned the issues of perjury and fabrication. Nothing regarding my or my firm's conduct. Additionally, the district court found that I violated section 1927 by filing our own motion for sanctions. However, Appley's motion for sanctions did not address that point, and did not raise that as an issue. Second, they failed to provide an opportunity to be heard. At the evidentiary hearing, they prevented appellants from utilizing key exhibits and key testimony regarding the alleged fabrication at issue. And at that point, certainly remained an ongoing dispute between the parties and their experts, and failed to send an oral argument hearing to provide appellants the opportunity to speak before deciding their motion. The district court also failed to provide enhanced procedural protections, considering the punitive nature of the attorney-free sanction award in this case. First, the sanction award was retrospective by reason of past wrongful conduct. Second, it did not seek to coerce future compliance. Third, there was no opportunity to purge. And fourth, the size of the payment was substantial. And finally, the district court failed to tailor the amount of the award to the alleged misconduct at issue. The district court ultimately awarded nearly $160,000 based on time records going back to September 2020. However, at a minimum, my firm and I should not be required to pay for fees, costs, or expenses until the evidentiary hearing in April 2021. Before that point, all I had was my client's sworn testimony, a credible forensic expert opining that the text messages were legitimate. Well, you know, you keep insisting that you put in a credible forensic expert. The district court specifically found that your expert's report was non-responsive and speculative. And looking at the record, it seems difficult for me to say that that was not a finding she could make. So I mean, I'm not sure you can stand in front of us and say that the expert reports were equal in some way. Well, to that end, I will note that police had the opportunity to spend $44,000 on their report, whereas my client was only able to spend a few thousand dollars on her report, which was essentially a rebuttal report to purported draft findings that were submitted to me in a conversation with counsel for police in February of 2021. It was a response to a 15-page PowerPoint. Their underlying expert report was something we hadn't seen until days before the evidentiary hearing. And in light of that report, and in preparation for the evidentiary hearing, we actually sought, my expert created demonstratives, tried to expand the record regarding the reason why he believed those text messages were legitimate, and we were prevented from doing so. So that speaks directly to the reports that are in the record, because they were the only reports that were allowed to be in the record. I was not allowed to expand the record to utilize demonstratives that I ultimately did argue in the underlying action should have been considered in my opposition to the police motion for sanctions and dismissal. Thank you, counsel. You've reserved a couple of minutes. Thank you. Thank you, Your Honors. May it please the Court. My name is Jean Schmidt, and I represent Appellees, Montefiore Medical Center, Norma Morales, and Patricia Ventimiglia. I believe the record is clear that the evidence supports the district court's findings on all the issues regarding the finding here that plaintiff engaged in fraud on the court. The record is very clear about all the instances in which she fabricated the text message. She then embarked upon a campaign to conceal the fabrication by spoliating evidence, and then submitted perjured testimony under deposition in a declaration to the court and at the hearing. The court made specific findings about each of those things. She also made specific findings, as Your Honors have pointed out, regarding the experts' reports in this case. She made- Excuse me. Yes. No, excuse me. I just sneezed. Specifically, what she found is this is not, as plaintiff's counsel has argued, a battle of the experts, or that he could rely or she could rely on her expert's opinion and report, because it did not address, as the court found, the majority of the indicia that indicated that the text message was, in fact, a fabrication. Among other things, it wasn't the photograph, as she testified to. It did not contain any of the indicia of a regular iPhone text message. It didn't comport with what she claimed happened to the phone, that it was cracked. The text message didn't reveal any cracks. In her own expert's opinion, where he testified that, in fact, somehow this all could have happened because the phone could have been, quote, he called, jailbroken, he did not provide any substantial evidence that, in fact, that's what happened. And, in fact, Mr. Alteris did not have his expert talk to the client and make a determination as to whether or not any of the speculations that led to him claiming that maybe this was not a fabrication to support his conclusion. So the district court correctly found that, in fact, she had fabricated the evidence. She does have that right to have an evidentiary hearing, make credibility findings, as she did in this case, based on the fact that this was a fraud on the court. This was not about the substance. Plaintiff talks about that the judge made dispositive issues of facts. She did not. The only thing she was deciding were facts relating to the fabrication and spoliation of evidence, which is totally within the district court's purview by the virtue of multiple cases, including Chambers v. Nasco, the Supreme Court decision, that when there is a fraud on the court, the district court is allowed to hold an evidentiary hearing, which he did, and to make credibility findings. And so in that case, she's not entitled to a jury trial because it's not about the underlying merits of the case. Could you address the point that Judge Walker raised earlier about the standard, the district court quoted language referring to negligence and recklessness- Correct. In the sense that bad faith should have been the appropriate standard for- Yes, I'd be happy to. First, let me say that with respect to the plaintiff, she did have, there was a finding of bad faith on her part and the imposition of the sanctions of dismissal, which were warranted. How does the judge make the bad faith finding, if you can help me? With respect to the, I was making a differentiation between the plaintiff and counsel. So with respect to plaintiff, it's on SPA-20 in the context of the finding of the bad faith. So I will now- You're not arguing that you made that finding with respect to counsel and that's the concern we have. Yes. With respect to, although the district court did not use, make a signing that plaintiff's counsel engaged in bad faith, she talked about negligence and not adhering to the professional standard. However, subsequently in her decision, she did talk about and made the finding that they had unreasonably and vexatiously multiplied the proceedings and then went on and went into detail in that, which is the standard for 1927, and went on to describe in great detail all the ways in which plaintiff's counsel should have been on notice or at least investigated the veracity of his client's complaints along the way and was relying and specifically quoted that when an attorney continues to litigate, even after learning of facts rendering the litigation fatally flawed, he has engaged in bad faith conduct sanctionable under section 1927. That's at SPA-19 of her decision. Page A-19. SPA, it was in the supplemental appendix- Yes, yes, what's the number? 19, page 19. The case is Leibowitz v. Banshell, Artist. So what we had here and why I believe that although there is not the term bad faith, there was a finding by the court of all of the conduct that in fact constitutes the bad faith that we have here because of the vexatious and prolonging procedure. And let me just point out how the district court came to that and the various points at which the record reveals that plaintiff's counsel should have known or at least questioned the veracity of his client. So we begin in March of 2020, which according to plaintiff is when she miraculously found her iPhone 5 and allegedly took a picture of it with her iPhone 10 and sent it to her counsel. That's on page A-32, her declaration. The evidence also shows that at the very same time, i.e. on March 16th, she sent him the phone. And it's in a FedEx envelope that's in the declaration of the expert that was retained to collect the text message data from the phone that we ultimately could not. And that's at page A-153, paragraphs 3 through 10. That indicates the timing of this. So contrary to what she testified to at her deposition and rather in her declaration, that I took the photo, I sent it to my counsel, I put it back in the drawer. It jumped out of the drawer and got broken. And then I sent it to my counsel. And that explains why there are no cracks on the text message. In fact, the evidence shows that she sent him the alleged text message in March and at the very same time sent the phone. We also know that when he got the phone, it was cracked, right? He also told the expert who was retained to collect the data that when he got the phone, he could not use the password to open the phone. So right then and there, he should have known that there was an issue. She allegedly used that passcode to open up that iPhone phone and take that picture. But all of a sudden, when he gets the phone, not only is it cracked, he can't use the code to open it. We never knew that at the time. I understand this is the record that supports the district court's finding, but the only question is whether, in light of what she said at SPA 26, that he negligently or recklessly failed to perform his responsibilities, whether that is sufficient when the requirement is bad faith. And in her findings in this section of SPA 26 and what follows, she does not characterize counsel's conduct as bad faith. Rather, she suggests that pages 27 through 28 that she's looking at his obligations as an attorney. I agree, Your Honor. That's absolutely correct. So why would not it be prudent to remand and let the district court state whether or not she found this conduct or finds this conduct to amount to bad faith? Certainly that is an option, Your Honor, but I would suggest that in the sections immediately following that, when she talks about 1927. So that first part that you're talking about, she talks about. She talks about 1927 earlier. Well, she sets the standard. Yes. She goes through and she sets the standard for inherent power. She sets the standard for Section 1927. Then she goes into the discussion of the facts. And the reference to negligence and so forth is when she is discussing her ability to issue sanctions under her inherent power. Immediately following that, on about page 29 of her decision, she then starts to talk about Section 1927. And she makes this statement that, I find that he has unreasonably and vexatiously multiplied the proceedings, and then refers back to her detailed recitation, which preceded that in her decision, which goes to this question of continuing to litigate when you know your case is fatally flawed. And so our position here is that at various points along the way, from the time he first got the phone to her deposition, when it was clear that her testimony was completely at odds with the evidence that she had given away her iPhone 10, which he already knew the passcode didn't work, that at a minimum he should have questioned her at that time, and that the next opportunity when we had our expert present a PowerPoint to him that demonstrated anomalies between the text message and what you would find, things that could not be explained away, even by his expert, he didn't bother to question her at all. When we ask him, now that we have this evidence, what are you going to do about it? His response to that was simply to say only I talked to my client and she maintains he sent me those text messages. If you look at the record at A22, A23, which is an exchange of e-mails, where we're asking him, so what is your basis for her still to contend that this is a valid text message? And his only response was because she says so. That's it. Let me ask you, because I do understand what you're relying on in the record, but you agree that the district court had to find bad faith. I do, Your Honor. Okay, so you're not urging any lesser standard. I am not. So really the only question is whether the record is sufficient for us to conclude that that is, in fact, the finding she made. That's exactly right. That's exactly right. And I can go to her. The question I have is that it's a little more confusing in her opinion, because she talks about should have known, and yet on Section 27, the test is learned of the fact. He didn't learn. Part of the evidence that you're presenting is that he didn't learn of the fact. He should have done more, which speaks to me to speak of malpractice or negligence as opposed to bad faith. Maybe I'm splitting hairs here, but it seems to me there is a difference. Well, I don't disagree, Your Honor, in terms of when you're applying the standard that under 1927, that bad faith is exhibited by continuing to litigate a case that you know is fatally flawed or doesn't have any merit, that you have to come to that conclusion. But at the same time, as a lawyer, you can't stand by and stick your head in the sand, and your client is saying, oh, this tablet is red, when it's clearly black, and you just keep repeating that, no matter what evidence comes to you that, in fact, the tablet is black. That bespeaks, in my mind, evidence of bad faith, because you are not taking any steps at all. You can't just stand there and say, I'm going to believe my client no matter what they say. And what I'm saying is that there are multiple opportunities here, and certainly at the point in which our expert displayed the fact that, in fact, this could not possibly be a text message, he, at that point, knew that his client was lying. Well, the point I guess I'm making is that a lawyer is a zealous advocate for his client all the way through. And unless there's a finding of bad faith, specifically, unless there's a finding of bad faith, we're in the gray area of lawyers who should have done a better job and didn't, and lawyers who are constantly pressing their client's position based upon some claim and maybe not have done enough investigation to find out that it's really wrong. And that's why I think it's important to have a finding of bad faith and support of that particular finding addressed by the district court. She may be able to very easily, if it was remanded, come to that conclusion. You argue that she should, but counsel will argue the other way, that no, this conduct is bad. We admit that it's bad, it's wrong, but it falls short of bad faith. We were trying to zealously advance our client's interests. And the only point I would make about that, Your Honor, and I don't disagree with what you have said, and it can run into, and you want to be careful about not interfering with advocacy on behalf of the client, but at the same time, as I think the cases that I referred to, Leibowitz, there's Huber v. Midland Credit, which we have cited, that at the point at which you are aware that your case is flawed, if you continue that, that, in fact, is bad faith. And here, I think the evidence and the record is very clear that at a minimum, after her deposition or at the point at which our expert clearly demonstrated that, in fact, this could not possibly be a photograph of a real text message, and there are 50 reasons why, and then when he goes to an expert and he simply says, I'm relying on that expert, but, again, that expert has no basis for his opinion. As the judge found, all he is saying is, it could have happened this way, it could have happened this way, it could have happened this way, with no underlying facts to suggest that, in fact, that happened. So that kind of expert report would be thrown out any day of the week in court. It's just useless. So you can't have an attorney that says, he's acting in good faith here and pursuing my claim, that sits back even to this day and relies upon an expert report that is virtually worthless because it's not based on any facts. Nor did the expert or he take the time to establish those facts. I just want to, I realize my time is up, but just on the point of the notice and opportunity to be heard on the issue of sanctions, I think it's important to recognize that, in fact, they were given lots of notice because in the pre-motion letter that we submitted in anticipation of making our motion for sanction, which was at A-17, which was March 15, 2001, we indicated that we intended to move for sanctions not only against the plaintiff, but also against the plaintiff's lawyer and his law firm for the reasons that we ultimately did. And at the, the court then gave plaintiff and her counsel the opportunity to get an expert. She then had an evidentiary hearing, and she alerted them that she was to make findings of fact. At the end of the hearing, she, based on her findings, granted our motion, which we had requested, for dismissal and sanctions. The court then, and this is at the record at A-410, the record then asked plaintiff's counsel about the schedule, and there is the back and forth about that. And then the court asked if he had agreed to the schedule, and he said yes. And then he said, I have a few questions. Is this a joint motion to dismiss and for sanctions happening all in one motion, or would you like them to be separate motions and two separate oppositions? The court responded, it can be a single motion to dismiss and for sanctions. Plaintiff's counsel then said, and I also wanted to inquire whether you are granting defendants the ability to move for sanctions against just the plaintiff or plaintiff and her counsel, and the court said both. So it is clear at that point, so this question of no notice and no opportunity to be heard is absolutely belied by the record. Then when we made our motion for sanctions, it was very clear what we were asking for and the basis for that. Plaintiff's counsel then had the opportunity to respond. So they had not only notice but an opportunity to be heard. And as the court, for example, in Shiffler, Nass, and Company, there was no need for an oral argument. In fact, he never asked for an oral argument. So their claim that he didn't have notice and opportunity to be heard on the issue of sanctions is belied by the record. Thank you. Thank you. Mr. Altheros, you deserve ten minutes for rebuttal. I will just note that at the conclusion of the evidentiary hearing, the district court stated, and this is on page A398, I'm willing to give you my findings with respect to the factual issues that have been presented to me, basically whether or not this document was fabricated and whether the plaintiff committed perjury, and therefore whether or not I will let the motion be made. So that is the context in which I am about to speak to counsel. The entirety of the evidentiary hearing, as I mentioned earlier, had nothing to do with respect to my or my firm's conduct. And, in fact, was the reason I needed to inquire to confirm whether the district court was allowing appellees to proceed with sanctions against me and my firm. This court previously... I'm a little perplexed why you think the judge's statement at the start of the proceedings narrowed. That was at the end of the hearing, right before she concluded, at the end. So throughout the hearing, you had every expectation it was going to be a matter of sanctions against you and your firm? No, I did not. I know that... Counsel just cited you to the record where the court said it would be a matter of sanctions against both your client and you. I know that that's what they were seeking. The evidentiary hearing, which, again, was not a chance to have a robust conversation about the text messages or about my conduct, did not concern my conduct or my firm's conduct whatsoever. What did you ask the judge to hear about your conduct? Did you either put in an affidavit or ask to take the stand or what? I mean, you did have an opportunity to be heard. What did you ask to be heard on? The judge just stated, only shortly before the evidentiary hearing, that this would be regarding the expert reports, testimony from those two experts, and rebuttal examinations. The procedure outlined by the district court in her order prior to the evidentiary hearing did not speak about whether I would have the opportunity to testify and did not invite such an opportunity to testify. No, which is why I reasonably assumed until I was forced to inquire that the leave for appellees to file their motion for sanctions had nothing to do with my conduct because my conduct wasn't meaningfully discussed aside from a single sentence in their pre-motion conference letter. I'll also note that this court previously noted that perjury and fabricated evidence are evils that can and should be exposed at trial. This case involves an ongoing dispute between the parties and their respective forensic experts. You don't disagree that a fraud on the court is a ground for dismissal. It's an extreme ground, but it is a ground for dismissal. And we have said that in deciding whether there has been a fraud committed on the court, that the judge can hear testimony and make fact-findings. So I was— I'm just asking you whether you agree that that's the precedent in this circuit. I agree. And the appellees make reference to Leibovitz, where fairly recently this court did make factual findings at an evidentiary hearing. But cases like Leibovitz and its ilk are extremely disanalogous to the instant case. In that case specifically, in part, the conduct involved undisputed conduct, which is not what's at issue here. The application to expand the record made by counsel at that evidentiary hearing was granted and was not in the instant case. The appellant's testimony in that case was at odds with statements made by his own associate, whereas the representations made by plaintiff and myself did not contradict anyone not involved and paid for by the defendants. And it was, in fact, corroborated by an independent forensic expert. If affirmed, the district court's decision will render the need for an expert opinion moot and essentially require that every attorney acquire specialized knowledge in order to scrutinize every email or text message received in discovery prior to any indication as to its falsity and independent of corroborating evidence, including an independent expert's opinion. In this case, my client and her expert both testified that these text messages were legitimate. Unfortunately, the lower court decided to disregard the testimony of these witnesses and prevent this ongoing issue of fact to be decided by the jury. For these reasons, in addition to those more fully explained in our briefs, we respectfully request that Your Honor vacate the district court's decision and remand the case to another judge for further proceedings. Thank you. Thank you, counsel. We'll make the case under advisement. That concludes our arguments for today, so I'll ask the courtroom deputy to adjourn. Court is adjourned.